## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

---

**TEKSYSTEMS, INC.,**

                    **Plaintiff,**

    **vs.**

**MICHAEL BAWCUM**
**2846 Easton Street**
**Downers Grove, Illinois 60515**

                    Case No.

**and**

**SHARAM KHOSRAVIPOUR**
**1735 W Diversey Parkway #116**
**Chicago, Illinois 60614**

**and**

**WUNDERLAND GROUP, LLC**
**200 West Jackson Street, Suite 1700**
**Chicago, Illinois 60606**


                    **Defendants.**

---

### COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

    Plaintiff TEKsystems, Inc. ("TEKsystems"), by its counsel, brings this Complaint against defendants Michael Bawcum ("Bacum"), Sharam Khosravipour ("Khosravipour") and WunderLand Group, LLC ("WunderLand") as follows:

### NATURE OF THE ACTION

    1.    This is an action to redress unlawful conduct by TEKsystems' former employees, Bawcum and Khosravipour, and their current employer, WunderLand. TEKsystems seeks to enforce its rights arising out of Bawcum's and Khosravipour's employment agreements, which are governed by Maryland law, as well as its rights under the Illinois Trade Secrets Act.

Additionally, WunderLand has been tortiously interfering and is continuing to tortiously interfere with Bawcum's and Khosravipour's employment agreements through its employment and continued employment of Bawcum and Khosravipour.

2.      The need for enforcement is particularly acute here because Bawcum and Khosravipour were intimately involved in the launching of TEKsystems' new creative and digital staffing initiative, which had been in the planning stages for many months and was launched near in time to Bawcum's and Khosravipour's departures to a direct competitor.

## PARTIES

3.      TEKsystems is a Maryland corporation with its principal place of business located in the state of Maryland.  TEKsystems is registered to do business in Illinois and maintains an office in Schaumburg.

4.      Bawcum is an Illinois citizen, residing at 2846 Easton Street, Downers Grove, IL 60515.  Bawcum was a TEKsystems employee from June 6, 2010 until his resignation on June 1, 2015.

5.      Khosravipour is an Illinois citizen, residing at 1735 W Diversey Parkway #116, Chicago, IL 60614.  Khosravipour was a TEKsystems employee from September 11, 2012 until his resignation on August 1, 2015.

6.      WunderLand is a limited liability corporation organized under the laws of the State of Illinois, with its principal place of business located in Chicago.  WunderLand is engaged in the same business as TEKsystems.  Upon information and belief, none of WunderLand's members are citizens of Maryland.

## JURISDICTION AND VENUE

7.     TEKsystems and defendants are citizens of different states. The amount in controversy is in excess of $75,000, exclusive of interest and costs, as the value to TEKsystems of the injunctive relief sought exceeds $75,000, based on the amount of business at issue if Defendants are permitted to continue their current course of conduct.   Subject matter jurisdiction is therefore proper under 28 U.S.C. § 1332(a).

8.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred or are occurring in this district.

## GENERAL BACKGROUND

9.     TEKsystems is engaged in the business of recruiting, employing and providing the services of technical service personnel, including but not limited to, programmers, engineers, network specialists, systems administrators, technical support specialists, helpdesk support, security analysts, and other IT positions on a temporary or permanent basis to companies throughout the United States, and in the Chicago area, in particular.

10.     TEKsystems provides its clients with IT staff specializing in a variety of services, such as application developments, digital and creative services, ERP services, end-user support, and network infrastructure services.

11.     For years, TEKsystems' application staffing and services has included consultants with a specialized focus on digital, creative and interactive skill sets.

12.     In July 2014, TEKsystems began to develop a strategy to formalize and enhance the new product line in the applications division focused on increasing its presence in the digital and creative IT staffing market.  In January 2015, TEKsystems launched its Digital and Creative

product line, but the new product line was not officially launched in the Chicagoland area until June 2015. Therefore, in the Chicagoland area, the recruiters and account managers helping to lead this digital and creative staffing initiative included those working in the Applications Division with prior experience placing TEKsystems consultants with digital, creative and interactive skill sets.

13. TEKsystems invested and continues to invest considerable resources to develop information, methods, and techniques to: (a) identify entities that utilize professional placement services to fill digital and creative staffing needs; (b) identify the key individuals responsible for recruitment of professional employees within those entities; (c) maintain, develop and nurture business relationships with those entities and individuals; (d) learn clients' business and digital and creative technological needs; (e) develop innovative solutions to meet clients' digital and creative staffing needs; (f) develop, screen, and maintain highly-qualified candidates with digital, creative and interactive skill sets for placement with its clients; and (g) set appropriate pricing to attract and maintain clients.

14. When TEKsystems launched its digital and creative product line, it developed new business development and marketing strategies, which it conveyed to its key digital and creative IT recruiters and account managers through meetings, bi-weekly and/or daily calls and e-mails. For example, the bi-weekly calls included discussion regarding: (1) the type of business they were targeting; (2) their marketing message to their consultants and how to differentiate themselves from their competitors; (3) their business development practice; (4) their expansion plans; (5) their current clients and what digital or creative projects or initiatives those clients were planning; (6) their prospective clients and any intel gathered regarding their digital or creative projects and initiatives.

15.     The information described in Paragraphs 13 and 14 is valuable, confidential, and proprietary to TEKsystems, and is not generally known in the public domain.

16.     Individuals employed by TEKsystems who are involved in the recruitment of potential digital and creative candidates and placement, *inter alia*, become intimately knowledgeable regarding TEKsystems' clients, financial information regarding its clients' rates, its contacts for those clients, its clients' digital and creative needs, and the digital and creative candidates TEKsystems has or may have to fill those needs.

17.     The aforementioned information has significant economic value to TEKsystems and would be of significant economic value to competitors in the professional digital and creative IT recruitment and placement industry.

18.     To protect its legitimate business interests with respect to the aforementioned information, TEKsystems requires that the individuals it employs to conduct professional recruitment and placement sign restrictive covenants and non-disclosure agreements as a condition of employment.  TEKsystems also maintains its client and candidate information in secure, password-protected databases.

**BACUM'S AND KHOSRAVIPOUR'S EMPLOYMENT WITH TEKSYSTEMS**

19.     On or about June 6, 2010, TEKsystems hired Bawcum for the position of Recruiter in its Schaumburg office.  Upon hire, Bawcum received training in TEKsystems' business and began working closely with TEKsystems' consultants.

20.     On December 30, 2012, TEKsystems promoted Bawcum to Account Manager. As Account Manager, Bawcum worked closely with TEKsystems clients, learning about their preferences, their businesses and their particular IT staffing needs.  Bawcum worked in the Applications Division placing IT staff with TEKsystems' clients in the Chicagoland area.

21.     On or about June 11, 2012, TEKsystems hired Khosravipour for the position of Recruiter in its Schaumburg office. Upon hire, Khosravipour received training in TEKsystems' business and began working closely with TEKsystems' consultants.

22.     On May 4, 2015, TEKsystems promoted Khosravipour to Account Manager. However, prior to that, Khosravipour had also worked as an account manager when an account manager in the Applications Division was on maternity leave. As Account Manager, Khosravipour worked closely with TEKsystems clients, learning about their preferences, their businesses and their particular IT staffing needs. Khosravipour worked in the Applications Division placing IT staff with TEKsystems' clients in the Chicagoland area.

23.     As members of the Applications Division, during the last two years of their employment with TEKsystems, Bawcum and Khosravipour placed consultants with digital, creative and interactive skill sets.

24.     At all times relevant to this matter, Bawcum and Khosravipour worked in TEKsystems' Schaumburg office.

25.     Prior to their employment with TEKsystems, neither Bawcum nor Khorsravipour had knowledge of TEKsystems' confidential information or trade secrets, *i.e.*, the identity of TEKsystems' clients, its contacts for those clients, pricing for various clients, its clients' needs and the data bank of information regarding potential candidates to fill positions. At the outset of their employment, Bawcum and Khosravipour received training from TEKsystems related to their positions recruiters to learn information regarding TEKsystems' confidential information. Thereafter, Bawcum and Khosravipour continued to receive training and gain knowledge of TEKsystems' confidential information during their tenure with the company.

26.     In carrying out their duties for TEKsystems, Bawcum and Khosravipour had access to proprietary and confidential information, including but not limited to: Client Lists, Client Service Agreements, Consultant Agreements, Bill Rate information based on skills of consultants and clients, RWS Information (resume and information database for all candidates). Bawcum and Khosravipour also participated in meetings to discuss current and target Digital and Creative accounts with other employees in TEKsystems' Schaumburg office, learning about opportunities with the accounts TEKsystems was and is servicing.

27.     When TEKsystems began planning the launch of its Digital and Creative product line, the management team for the new line of business included Bawcum in its bi-weekly and/or daily business development and marketing strategy meetings. Khosravipour was also exposed to business development and marketing strategy meetings for the digital and creative line of business. Additionally, Bawcum also received the digital and creative business emails containing TEKsystems marketing material for this new line of business.

28.     During their employment with TEKsystems, Bawcum and Khosravipour each had a duty to, among other things, gain familiarity with candidates; to evaluate them; maintain business relationships with existing clients; develop and maintain lists of candidates, clients and contacts; and work diligently to develop the business of TEKsystems.

29.     As employees of TEKsystems and through the use of TEKsystems' resources, Bawcum and Khosravipour developed and maintained relationships with the digital and creative candidates in TEKsystems' database, as well as TEKsystems' clients with digital and creative IT staffing needs.

30.     Bawcum's and Khosravipour's duties each included creating goodwill for TEKsystems through personal contacts and business relationships.

31.     As employees of TEKsystems and through the use of its resources, Bawcum and Khosravipour each had access to and was exposed to the following confidential information:

a.      the identity of TEKsystems' clients;

b.      the identity of the contact persons at TEKsystems' clients who decide or have significant influence regarding which recruiting/placement firm(s) they will use;

c.      the billing rates TEKsystems charges each of its clients (which vary by client);

d.      the placement/recruitment history of TEKsystems with clients and current/future staffing requirements;

e.      margin tolerances regarding prices including wage rates of contract employees;

f.      sales and marketing strategies for this new Digital and Creative product line;

g.      the particular idiosyncrasies of each client/contact person including their preferences, likes, and dislikes regarding recruiting/placement;

h.      the employment histories, qualifications, contact information, and preferences of candidates suitable to satisfy clients' requirements.

32.     The information referenced in paragraph 31 above is not otherwise obtainable from public sources and constitutes confidential information and trade secrets.

## BAWCUM'S EMPLOYMENT CONTRACT

33.     Bawcum signed an Employment Agreement (the "Bawcum Agreement") with TEKsystems, which included non-compete, non-solicit and non-disclosure obligations.

34.     The Bawcum Agreement became effective on June 6, 2010.  A copy is attached as Exhibit A.

35.     The  Bawcum Agreement provides, in relevant part, as follows:

**3.     NON-COMPETE  COVENANT:** EMPLOYEE  agrees  that  upon  the termination  of  EMPLOYEE's  employment,  whether  by  TEKSYSTEMS  or

EMPLOYEE and whether with or without cause, for a period of eighteen (18) months thereafter EMPLOYEE shall not directly or indirectly engage in or prepare to engage in, or be employed by, any business that is engaging in or preparing to engage in any aspect of TEKSYSTEM' Business for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the two (2) year period preceding termination of employment, within a radius of fifty (50) miles from the office in which EMPLOYEE worked at the time EMPLOYEE's employment terminated or any other office in which EMPLOYEE worked during the two (2) year period preceding termination of employment ("Restricted Area"). The prohibitions contained in this Paragraph shall extend to (i) activities undertaken by EMPLOYEE directly on EMPLOYEE's own behalf, and to (ii) activities undertaken by EMPLOYEE indirectly through any individual, corporation or entity which undertakes such prohibited activities with EMPLOYEE's assistance and in or with respect to which EMPLOYEE is an owner, officer, director, trustee, shareholder, creditor, employee, agent, partner or consultant or participates in some other capacity.

**4. NON-SOLICITATION COVENANT**: EMPLOYEE agrees that upon the termination of EMPLOYEE's employment, whether by TEKSYSTEMS or EMPLOYEE and whether with or without cause, for a period of eighteen (18) months thereafter EMPLOYEE shall not directly or indirectly:

> (a)     Communicate with any individual, corporation or other entity which is a customer of TEKSYSTEMS and, about which EMPLOYEE obtained Confidential Information or with which EMPLOYEE did business on TEKSYSTEMS' behalf during the two (2) year period preceding termination of employment for the purpose of:

>> (i)     entering into any business relationship with such customer if the business relationship is competitive with any aspect of TEKSYSTEMS' Business for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the two (2) year period preceding termination of employment, or

>> (ii)     reducing or eliminating the business such customer conducts with TEKSYSTEMS; or

> (b)     Communicate with any person who has been a Regular Employee within the two (2) year period prior to the date of termination of EMPLOYEE's employment and about whom EMPLOYEE obtained knowledge or had contact by reason of EMPLOYEE's employment with TEKSYSTEMS for the purpose of:

> (i)      providing services to any individual, corporation or entity whose business is competitive with TEKSYSTEMs, or
>
> (ii)      leaving the employ of TEKSYSTEMS; or

(c)      Communicate with any person who has been a Contract Employee within the two (2) year period prior to the date of termination of EMPLOYEE's employment and about whom EMPLOYEE obtained knowledge or had contact by reason of EMPLOYEE's employment with TEKSYSTEMS for the purpose of:

> (i)      ceasing work for TEKSYSTEMS at customers of TEKSYSTEMS, or
>
> (ii)      refraining from beginning work for TEKSYSTEMS at customers of TEKSYSTEMS, or
>
> (iii)      providing services to any individual, corporation or entity whose business is competitive with TEKSYSTEMS.

As used in this Paragraph 4: "Regular Employee" means an employee of TEKSYSTEMS who is not a "Contract Employee"; and "Contract Employee" means an employee or candidate for employment of TEKSYSTEMS who is or was employed to perform services or solicited by EMPLOYEE to perform services at customers of TEKSYSTEM.

The prohibitions contained in (a), (b) and (c) above shall extend to (i) activities undertaken by EMPLOYEE directly on EMPLOYEE's own behalf, and to (ii) activities undertaken by EMPLOYEE indirectly through any individual, corporation or entity which undertakes such prohibited activities with EMPLOYEE's assistance and in or with respect to which EMPLOYEE is an owner, officer, director, trustee, shareholder, creditor, employee, agent, partner or consultant or participates in some other capacity.

* * *

**6. COVENANT NOT TO DIVULGE CONFIDENTIAL INFORMATION**: EMPLOYEE covenants and agrees that, except as required by the proper performance of EMPLOYEE's duties for TEKSYSTEMS, EMPLOYEE shall not use, disclose or divulge any Confidential Information of TEKSYSTEMS to any other person, entity or company besides TEKSYSTEMS. For purposes of this Agreement, "Confidential Information" shall mean information not generally known by the competitors of TEKSYSTEMS or the general public concerning TEKSYSTEMS Business that TEKSYSTEMS take reasonable measures to keep secret, including but not limited to: financial information and financial controls; sales and marketing strategies; acquisition plans; pricing and costs; customers'

names, addresses, telephone numbers, and contact persons; customers' staffing requirements; margin tolerances regarding pricing; the names, addresses, telephones numbers, skill sets, availability and wage rates of Contract Employees; sales, recruiting, pricing and marketing techniques; sales and recruiting manuals; forms and processes for acquiring and recording information; salary and performance evaluations of Regular Employees; and management practices, procedures and processes. These restrictions on use or disclosure of Confidential Information will only apply for three (3) years after the end of EMPLOYEE's employment where information that does not qualify as a trade secret is concerned. The restrictions will apply to trade secret information for as long as the information remains qualified as a trade secret.

36.     The Bawcum Agreement also provides that "[t]he terms of Paragraphs 3 through 15 of this Agreement shall survive the termination, for whatever reason, of EMPLOYEE's employment with TEKSYSTEMS." (Ex. A, ¶ 2). The Bawcum Agreement further allows TEKsystems to recover its attorneys' fees and costs should it prevail in any action to enforce the Agreement or seek damages or injunctive relief. (Ex. A, ¶ 14).

37.     To avoid issues with violation of post-employment restrictions, the Bawcum Agreement includes an "Early Resolution Conference" provision that requires the employee to provide TEKsystems written notice prior to violating the Agreement's Paragraph's 3, 4, 6, or 7, followed by mediation at TEKsystems' discretion to resolve any dispute. (Ex. A, ¶ 13).

38.     The Bawcum Agreement contains a choice of law provision to apply Maryland law. (Ex. A, ¶ 10).

**KHOSRAVIPOUR'S EMPLOYMENT CONTRACT**

39.     Khosravipour signed an Employment Agreement (the "Khosravipour Agreement") with TEKsystems, which included non-compete, non-solicit and non-disclosure obligations.

40.     The Khosravipour Agreement became effective on June 11, 2012. A copy is attached as Exhibit B.

41.     The Khosravipour Agreement provides, in relevant part, as follows:

**3. NON-COMPETE COVENANT:** EMPLOYEE agrees that upon the termination of EMPLOYEE's employment, whether by TEKSYSTEMS or EMPLOYEE and whether with or without cause, for a period of eighteen (18) months thereafter EMPLOYEE shall not directly or indirectly engage in or prepare to engage in, or be employed by, any business that is engaging in or preparing to engage in any aspect of TEKSYSTEM' Business for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the two (2) year period preceding termination of employment, within a radius of fifty (50) miles from the office in which EMPLOYEE worked at the time EMPLOYEE's employment terminated or any other office in which EMPLOYEE worked during the two (2) year period preceding termination of employment ("Restricted Area"). The prohibitions contained in this Paragraph shall extend to (i) activities undertaken by EMPLOYEE directly on EMPLOYEE's own behalf, and to (ii) activities undertaken by EMPLOYEE indirectly through any individual, corporation or entity which undertakes such prohibited activities with EMPLOYEE's assistance and in or with respect to which EMPLOYEE is an owner, officer, director, trustee, shareholder, creditor, employee, agent, partner or consultant or participates in some other capacity.

**4. NON-SOLICITATION COVENANT**: EMPLOYEE agrees that upon the termination of EMPLOYEE's employment, whether by TEKSYSTEMS or EMPLOYEE and whether with or without cause, for a period of eighteen (18) months thereafter EMPLOYEE shall not directly or indirectly:

(a) Communicate with any individual, corporation or other entity which is a customer of TEKSYSTEMS and, about which EMPLOYEE obtained Confidential Information or with which EMPLOYEE did business on TEKSYSTEMS' behalf during the two (2) year period preceding termination of employment for the purpose of:

(i) entering into any business relationship with such customer if the business relationship is competitive with any aspect of TEKSYSTEMS' Business for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the two (2) year period preceding termination of employment, or

(ii) reducing or eliminating the business such customer conducts with TEKSYSTEMS; or

(b) Communicate with any person who has been a Regular Employee within the two (2) year period prior to the date of termination of EMPLOYEE's employment and about whom EMPLOYEE obtained knowledge or had contact by reason of

EMPLOYEE's employment with TEKSYSTEMS for the purpose of:

      (i)     providing services to any individual, corporation or entity whose business is competitive with TEKSYSTEMs, or

      (ii)    leaving the employ of TEKSYSTEMS; or

(c)    Communicate with any person who has been a Contract Employee within the two (2) year period prior to the date of termination of EMPLOYEE's employment and about whom EMPLOYEE obtained knowledge or had contact by reason of EMPLOYEE's employment with TEKSYSTEMS for the purpose of:

      (i)     ceasing work for TEKSYSTEMS at customers of TEKSYSTEMS, or

      (ii)    refraining from beginning work for TEKSYSTEMS at customers of TEKSYSTEMS, or

      (iii)   providing services to any individual, corporation or entity whose business is competitive with TEKSYSTEMS.

As used in this Paragraph 4: "Regular Employee" means an employee of TEKSYSTEMS who is not a "Contract Employee"; and "Contract Employee" means an employee or candidate for employment of TEKSYSTEMS who is or was employed to perform services or solicited by EMPLOYEE to perform services at customers of TEKSYSTEM.

The prohibitions contained in (a), (b) and (c) above shall extend to (i) activities undertaken by EMPLOYEE directly on EMPLOYEE's own behalf, and to (ii) activities undertaken by EMPLOYEE indirectly through any individual, corporation or entity which undertakes such prohibited activities with EMPLOYEE's assistance and in or with respect to which EMPLOYEE is an owner, officer, director, trustee, shareholder, creditor, employee, agent, partner or consultant or participates in some other capacity.

* * *

**6.  COVENANT NOT TO DIVULGE CONFIDENTIAL INFORMATION**: EMPLOYEE covenants and agrees that, except as required by the proper performance of EMPLOYEE's duties for TEKSYSTEMS, EMPLOYEE shall not use, disclose or divulge any Confidential Information of TEKSYSTEMS to any other person, entity or company besides TEKSYSTEMS. For purposes of this Agreement, "Confidential Information" shall mean information not generally known by the competitors of TEKSYSTEMS or the general public concerning

13

TEKSYSTEMS Business that TEKSYSTEMS take reasonable measures to keep secret, including but not limited to: financial information and financial controls; sales and marketing strategies; acquisition plans; pricing and costs; customers' names, addresses, telephone numbers, and contact persons; customers' staffing requirements; margin tolerances regarding pricing; the names, addresses, telephones numbers, skill sets, availability and wage rates of Contract Employees; sales, recruiting, pricing and marketing techniques; sales and recruiting manuals; forms and processes for acquiring and recording information; salary and performance evaluations of Regular Employees; and management practices, procedures and processes.  These restrictions on use or disclosure of Confidential Information will only apply for three (3) years after the end of EMPLOYEE's employment where information that does not qualify as a trade secret is concerned.  The restrictions will apply to trade secret information for as long as the information remains qualified as a trade secret.

42.     The Khosravipour Agreement also provides that "[t]he terms of Paragraphs 3 through 15 of this Agreement shall survive the termination, for whatever reason, of EMPLOYEE's employment with TEKSYSTEMS." (Ex. A, ¶ 2).  The Khosravipour Agreement further allows TEKsystems to recover its attorneys' fees and costs should it prevail in any action to enforce the Agreement or seek damages or injunctive relief.  (Ex. A, ¶ 14).

43.     To avoid issues with violation of post-employment restrictions, the Khosravipour Agreement includes an "Early Resolution Conference" provision that requires the employee to provide TEKsystems written notice prior to violating the Agreement's Paragraph's 3, 4, 6, or 7, followed by mediation at TEKsystems' discretion to resolve any dispute.  (Ex. A, ¶ 13).

44.     The Khosravipour Agreement contains a choice of law provision to apply Maryland law.  (Ex. A, ¶ 10).

**BAWCUM'S AND KHOSRAVIPOUR'S RESIGNATION FROM TEKSYSTEMS**

45.     Bawcum resigned his employment with TEKsystems on May 29, 2015.  Although Bawcum initially gave two-week notice, on June 1, he advised TEKsystems he was resigning immediately given the nature of his new employer.

46.     Khosravipour resigned his employment with TEKsystems on August 1, 2015.

47.     By the fact of their employment with TEKsystems, and the knowledge they derived therefrom, Bawcum and Khosravipour each took with him upon his resignation TEKsystems' sensitive, confidential, proprietary and trade secret information.

48.     In particular, Bawcum and Khosravipour each took with him knowledge regarding candidates' preferences, work and salary histories, TEKsystems' clients, the contact persons of those clients, the idiosyncrasies of the clients/contact persons, the clients' recruiting/placement needs, the account managers' assessment of the clients' future needs and plans for meeting those needs, and TEKsystems business development and marketing strategies for its digital and creative line of business.

**BAWCUM'S AND KHOSRAVIPOUR'S POST-RESIGNATION CONDUCT**

49.     While the exact dates of employment are not yet known, Bawcum became employed by WunderLand in or around June 2015, and Khosravirpour became employed by WunderLand in or around August 2015.

50.     WunderLand is engaged in the business of recruitment and placement of employees to address clients' digital and creative technology needs.  WunderLand competes in the same marketplace as TEKsystems.

51.     Bawcum's employment with WunderLand violates or has violated Paragraph 3 of the Bawcum Agreement in that he has been working or has worked within the 50 mile radius of the TEKsystems' Schaumburg office.

52.     Khosravipour's employment with WunderLand violates or has violated Paragraph 3 of the Khosravipour Agreement in that he has been working or has worked within the 50 mile radius of the TEKsystems' Schaumburg office.

53.     Bawcum's position with WunderLand as an account manager, the same position he held with TEKsystems, has caused or will cause the inevitable disclosure of TEKsystems confidential and trade secret information.

54.     Khosravipour's position with WunderLand as an account manager, the same position he held with TEKsystems, has caused or will cause the inevitable disclosure of TEKsystems confidential and trade secret information.

55.     Bawcum's violation of his Agreement, along with his violations of Illinois common law, have caused and will continue to cause TEKsystems irreparable damage in excess of $75,000, exclusive of interest and costs, which represents the value of the rights sought to be protected by TEKsystems.

56.     Khosravipour's violation of his Agreement, along with his violations of Illinois common law, have caused and will continue to cause TEKsystems irreparable damage in excess of $75,000, exclusive of interest and costs, which represents the value of the rights sought to be protected by TEKsystems.

57.     TEKsystems sent letters to Bawcum and WunderLand regarding Bawcum's departure, but those letters were ignored.  When Khosravipour later left to join WunderLand, TEKsystems sent letters to Bawcum, Khosravipour and WunderLand, indicating that a lawsuit would be filed in the absence of a prompt response.  Counsel representing all three defendants then responded.  The response did not deny that Bawcum and Khosravipour were performing very similar jobs for WunderLand, or that this would continue.

58.     The response indicated that while the employment would continue (absent judicial relief), Bawcum and Khosravipour would honor the nonsolicitation and confidentiality provisions of their agreements.  However, this response was inadequate for two reasons.

16

59.     First, even staying away from TEKsystems customers would not fully address the broad-based concerns over the knowledge that Bawcum and Khosravipour had obtained regarding the new digital and creative staffing initiative.

60.     Second, it quickly became apparent that even these assurances were unreliable. While WunderLand stated Bawcum would not solicit TEKsystems clients, in August, Bawcum attended a call with a TEKsystems client seeking to fill a digital and creative staffing position, the same job requisition for which TEKsystems was directly competing.

61.     Furthermore, while WunderLand stated Khosravipour would not solicit TEKsystems clients, in August, Khosravipour met with a TEKsystems consultant at a TEKsystems' client site. Khosravipour's only relationship with the consultant was his work for TEKsystems.

### COUNT I - BREACH OF CONTRACT
### (AGAINST BAWCUM)

62.     TEKsystems incorporates and re-alleges paragraphs 1 through 61 of this Complaint as if those allegations are fully set forth in this paragraph.

63.     Based on the Bawcum Agreement's choice-of-law provision, this claim is governed by Maryland law.

64.     All conditions precedent necessary for the enforcement of the Agreement have been satisfied.

65.     Bawcum's Agreement is reasonably necessary to protect TEKsystems' legitimate business interests, including without limitation TEKsystems' trade secrets and confidential information, its business relationships, and its investment in training.

66.     Bawcum has breached his obligations under the Agreement by engaging in TEKsystems' business in which he performed services during his employment with TEKsystems

within a 50-mile radius of his place of employment in a function similar if not identical to the functions he performed for TEKsystems.

67.     Bawcum has breached his obligations under the Agreement by inevitably using and/or disclosing TEKsystems' Confidential Information based on his identical or near-identical job responsibilities with WunderLand.

68.     Bawcum has breached the Agreement by failing to provide written notice as required by Paragraph 13's Early Resolution Conference provision.

69.     Bawcum's wrongful actions have proximately damaged TEKsystems' legitimate business interests, goodwill, and reputation and have denied TEKsystems the benefit of its bargain with respect to the Agreement.

70.     TEKsystems has been injured irreparably and otherwise, as a direct and proximate result of the breaches of contract by Bawcum and has suffered damages in an amount to be proved at trial.

## COUNT II - BREACH OF CONTRACT
### (AGAINST KHOSRAVIPOUR)

71.     TEKsystems incorporates and re-alleges paragraphs 1 through 61 of this Complaint as if those allegations are fully set forth in this paragraph.

72.     Based on the Khosravipour Agreement's choice-of-law provision, this claim is governed by Maryland law.

73.     All conditions precedent necessary for the enforcement of the Agreement have been satisfied.

74.     Khosravipour's Agreement is reasonably necessary to protect TEKsystems' legitimate business interests, including without limitation TEKsystems' trade secrets and confidential information and its business relationships, and its investment in training.

75.     Khosravipour has breached his obligations under the Agreement by engaging in TEKsystems' business in which he performed services during his employment with TEKsystems within a 50-mile radius of his place of employment, in a function similar if not identical to the functions he performed for TEKsystems..

76.     Khosravipour has breached his obligations under the Agreement by inevitably using and/or disclosing TEKsystems' Confidential Information based on his identical or near-identical job responsibilities with WunderLand.

77.     Khosravipour has breached the Agreement by failing to provide written notice as required by Paragraph 13's Early Resolution Conference provision.

78.     Khosravipour's wrongful actions have proximately damaged TEKsystems' legitimate business interests, goodwill, and reputation and have denied TEKsystems the benefit of its bargain with respect to the Agreement.

79.     TEKsystems has been injured irreparably and otherwise, as a direct and proximate result of the breaches of contract by Khosravipour and has suffered damages in an amount to be proved at trial.

## COUNT III - MISAPPROPRIATION OF TRADE SECRETS
### (AGAINST BAWCUM)

80.     TEKsystems incorporates and re-alleges paragraphs 1 through 61 of this Complaint as if those allegations are fully set forth in this paragraph.

81.     Bawcum has knowledge of TEKsystems' confidential information concerning its digital and creative line of business, including, but not limited to, its business plans and strategies, customer information and lists, Contract Employees, financial information concerning the company's products and other proprietary information relating to TEKsystems' business, the

disclosure and misappropriation of which poses a significant threat to TEKsystems' ongoing business in Illinois.

82.     TEKsystems has made reasonable efforts to maintain the confidentiality of such information.

83.     TEKsystems' confidential information,has actual and potential independent and economic value to TEKsystems and is not generally known to nor readily ascertainable by TEKsystems' competitors.

84.     TEKsystems' confidential informationwere developed by TEKsystems and constitute "trade secrets" within the meaning of Illinois' Uniform Trade Secret Act, 765 ILCS 1065/1 ("Act").

85.     Based on his job responsibilities with WunderLand, Bawcum has inevitably disclosed or used, or will inevitably disclose or use TEKsystems' confidential information.

86.     As a direct and proximate result of Bawcum's violation of the Act, TEKsystems has been and will continue to be severely and irreparably damaged.

87.     This Court has jurisdiction to enjoin the actual or threatened misappropriation of TEKsystems' trade secrets pursuant to the Act and is authorized to award damages for such misappropriation pursuant to the Act.

## COUNT IV - MISAPPROPRIATION OF TRADE SECRETS
### (AGAINST KHOSRAVIPOUR)

88.     TEKsystems incorporates and re-alleges paragraphs 1 through 61 of this Complaint as if those allegations are fully set forth in this paragraph.

89.     Khosravipour has knowledge of TEKsystems' confidential information concerning its digital and creative line of business, including, but not limited to, its business plans and strategies, customer information and lists, Contract Employees, financial information

concerning the company's products and other proprietary information relating to TEKsystems' business, the disclosure and misappropriation of which poses a significant threat to TEKsystems' ongoing business in Illinois.

90.     TEKsystems has made reasonable efforts to maintain the confidentiality of such information.

91.     TEKsystems' confidential informationhas actual and potential independent and economic value to TEKsystems and is not generally known to nor readily ascertainable by TEKsystems' competitors.

92.     TEKsystems' confidential informationwere developed by TEKsystems and constitute "trade secrets" within the meaning of Illinois' Uniform Trade Secret Act, 765 ILCS 1065/1 ("Act").

93.     Based on his job responsibilities with WunderLand, Khosravipour has inevitably disclosed or used, or will inevitably disclose or use TEKsystems' confidential information.

94.     As a direct and proximate result of Khosravipour's violation of the Act, TEKsystems has been and will continue to be severely and irreparably damaged.

95.     This Court has jurisdiction to enjoin the actual or threatened misappropriation of TEKsystems' trade secrets pursuant to the Act and is authorized to award damages for such misappropriation pursuant to the Act.

## COUNT V - TORTIOUS INTERFERENCE WITH BAWCUM CONTRACT
### (AGAINST WUNDERLAND)

96.     TEKsystems incorporates and re-alleges paragraphs 1 through 70 of this Complaint as if those allegations are fully set forth in this paragraph.

97.     TEKsystems has a valid and enforceable agreement with Bawcum.

98.     WunderLand has and has had knowledge of the Agreement.

99. Despite its knowledge of the terms of Bawcum's post-employment restrictions under the Agreement, WunderLand has intentionally and improperly interfered with Bawcum's performance of the Agreement by employing and continuing to employ him, and endorsing and/or ratifying his breach of that Agreement. WunderLand's actions in causing Bawcum not to perform the obligations under the Agreement were and are not justified or privileged.

100. As a direct and proximate result of WunderLand's improper interference, without justification or privilege, TEKsystems has been severely and irreparably damaged.

101. TEKsystems will not have an adequate remedy at law for the harm and damage that the acts of WunderLand and its tortious interference with TEKsystems' contract will cause.

### COUNT VI - TORTIOUS INTERFERENCE WITH KHOSRAVIPOUR CONTRACT
### (AGAINST WUNDERLAND)

102. TEKsystems incorporates and re-alleges paragraphs 1 through 61 and 71 through 79 of this Complaint as if those allegations are fully set forth in this paragraph.

103. TEKsystems has a valid and enforceable agreement with Khosravipour.

104. WunderLand has and has had knowledge of the Agreement.

105. Despite its knowledge of the terms of Khosravipour's post-employment restrictions under the Agreement, WunderLand has intentionally and improperly interfered with Khosravipour's performance of the Agreement by employing and continuing to employ him, and endorsing and/or ratifying his breach of that Agreement. WunderLand's actions in causing Khosravipour not to perform the obligations under the Agreement were and are not justified or privileged.

106. As a direct and proximate result of WunderLand's improper interference, without justification or privilege, TEKsystems has been severely and irreparably damaged.

22

107.    TEKsystems will not have an adequate remedy at law for the harm and damage that the acts of WunderLand and its tortious interference with TEKsystems' contract will cause.

## PRAYER FOR INJUNCTIVE RELIEF AND DAMAGES

WHEREFORE, TEKsystems demands the following:

a.      For Counts I, II, III and IV, temporary restraining orders, preliminary and permanent injunctions restraining and enjoining Bawcum and Khosravipour from continuing to breach the Agreements, specifically enforcing the Agreements, and enjoining Bawcum's and Khosravipour's violations of the Act, and for actual damages based on Counts I, II, III and IV to be proved at trial, along with unjust enrichment and punitive damages based on Counts III and IV to be proved at trial;

b.      For Counts V and VI, temporary restraining orders, preliminary and permanent injunctions restraining and enjoining WunderLand from continuing to interfere with the Agreements, and for actual and punitive damages to be proved at trial;

c.      reasonable attorneys' fees and costs against Bawcum and Khosravipour based on their violations of the Agreements and the Act; and

d.      such other and further relief as this Court may deem proper.

Respectfully submitted,

*/s/ David K. Haase*
David K. Haase

David K. Haase ARDC# 6201278
Melissa L. McDonagh ARDC# 6283231
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1000
Chicago, IL 60654
312.372.5520
Dated: September 21, 2015